Haynes. J.
'(Orally.)
In the cases of First National Bank against Robert H. Rice, ■and others (there are two cases upon the docket, which are really but one) an action is brought for the purpose of setting aside certain transfers of property subjecting the property to the pajunent of a certain judgment that is due from Robert Rice to the First National Bank of Fremont, Ohio.
We have listened to the testimony for a period of five days and the arguments of counsel for two days, and realizing the importance of the case to the respective parties we have endeavored to give the case very careful consideration.
We have been aided by the arguments of counsel which have been very full and elaborate and have coverer substantially every point arising in the case.
In the view we take of the case I shall not endeavor to go through all the evidence or the various points that were discussed by counsel; we do not think it is necessary to do so.
Indeed, as plainly appears' from the arguments of counsel, it would take a long period of time to do that. Nor shall I recount at any great length the facts of the case.
The first question of importance that was made and argued :to us was the question of the insolvency of the Trommer Malt ■Compairy from the year 1886, and from that time forward until 1893 and 1894. The testimony upon that point has' been voluminous, necessarily so, because the period of time covered is quite a number of years, and the business of the company was' very extensive and was indeed a very large business, and it is somewhat difficult to arrive at a just or correct conclusion in regard ro its condition, and yet, as we are required to make a finding of facts, it is proper we should communicate our views in regard to the insolvency of the company.
In the year 1886, the company was doing business; it had been doing a very successful business; its sales had been large and its income had been large. In 1886, and the following year perhaps, the business had fallen off somewhat. The causes that are given are not perhaps fully given, or attempted ±0 be given, but they are' somewhat foreshadowed in that there had been some trouble with the manufactured article; that it *186 had spoiled in the hands of the purchasers, or in some way bencame so it was not so useful as formerly, and it seemed this affected the business of the company so that about that time the sales had fallen off, in an amount of $ — ■-down perhaps to some $8,000 per month; nevertheless the business was carried on, and the sales as estimated by the report of the master commissioner each month were from three, four, five or six thous- and dollars up and sometimes larger; they would average nearly $5,000 a month, at the lowest figure that was placed by the report, or nearly $60,000 a year, which would average about $5,000 a month. So it was a growing business, an active business; it was a business that was producing a revenue, and it was a business to all appearances that was being carried forward at a profit, that is at a profit on the manufactured article. It had not been managed perhaps always with wisdom, or the assets and earnings had not been turned in to the-company and kept there as in the judgment of the court would have been wise and prudent on the part of the company to have-done, but it was an active business, it had prospered and was-capable of producing valuable results financially.
The company had at this time about seventy-one acres of land lying in the county of Cuyahoga, and testimony has been.taken as to the value of the property at the time, varying from a low amount up to perhaps $1,000 an acre. It had upon it a., mortgage of some $7,000 I think. That property had been, purchased by the sale of the manufactured article of the malt, company; that is to say, they purchased the land and paid for it in malt products, so it became an asset of the company, and was one of the results of the sales, and that may have added to-the amount of the sales in some of the previous years over and above what the ordinary cash sales would have been. In the fall of 1887, the indebtedness of the company was nearly-$60,000, upwards of $50,000, I believe. The bank had asked*, all of these members of the firm, composed of three parties, foradditional security for that debt and a mortgage was executed-» upon this Cleveland property to the bank; in addition to that,, mortgages were given by separate parties of the firm upon the-; real estate that they owned personally, and to that extent the-real estate of the individual partners was pledged to- the payment of this debt, in fact it became an asset of the. firm. The: *187 'business ran along until 1889, anil a.% that time the company ■sold, the assets were sold, there was transfer of the malt company property. It was sold, and 'was incorporated by the purchasers. The purchasers, as appears by the evidence, agreed to pay $75,000 in cash and notes for the assets and the good will of the company; $25,000 in cash-and the balance in notes, but -owing to the fact that some of this’ manufactured extract of malt that had been sent out was not in good condition, there was a deduction made of $10,000, so that the sale was $65,000; and in ad.dition to that, the purchasers transferred one hundred and thirty-one shares of the stock, valued at $100 per share in the new company formed, which made a .transfer of $13,100 in stock of the new company to these three parties composing the old firm, and a portion of that, the portion'that belonged to Robert Rice (he had forty-five shares, and the portion that belonged to John Rice, I forget the exact number of shares he had) was transferred by them to the plaintiff bank as additional security for the amount that was owing to the bank by the malt company Robert H. Rice was appointed by the members of the "firm to collect the assets of the company, that is to say, he received $25,000 in cash, and received from tim!e to time from the new company the amount of the balance of the purchase money, so that perhaps within a'year from that time, to-wit: in the fall of 1890 there had been paid in to him the amount of this $65,000, and in addition to that there had been paid to him certain rents that he received, that were paid by the new company to the old firm for the use of the real estate, and he had .used these sums in the payment of the floating indebtedness ■of the company, for debts upon merchandise and other purposes, none of it going to the payment of the amount that was ■ due to the bank. And he continued to receive and collect in whatever might be the assets of he company still remaining outstanding, until some time about 1893, when the whole .amount had been received, and paid out, making as it was said, .an aggregate of $80,000..
Now, we are of the opinion, and we-so hold, that in 1886, the ■available assets, including good will of the company and real estate, were practically equal to'its'indébtedness. It was solvent in the sense that if a sale had been made'at that time of. all of the property of the firm at the fair market value existing at *188 that time, we think it would have paid the debts of the concern and perhaps left a little profit to the original parties. It was also a growing concern, not only, we hold, for those who managed itt even under conditions that then existed, but as'a matter of fact because when it passed into the hands of the new company, it pressed forward and earned money, and the stock that was earned over to the bank realized in the first place, profits that were paid to it and from the sale of property, so-that some $8,000 was realized by the bank from the stock that had been turned over by Robert and John B. Rice to it. We, however, make this finding simply because we are requested by counsel to make a finding of facts in the case, and this was-an issue made in the case. In the view we take of the case we do not consider it practically important.
Now the record shows that in 1890, about the time that. Robert Rice had closed up the buisness of The Trommer Malt Company, some other facts occurred, rather accidentally as it would seem, at first, because it appears that some party was here at one time selling a certain knife that was used for household purposes, cutting bread, etc., and he had a conversation with parties who either reported to, or had a conversation with Mr. Cress, who was a manager in the new malt company, at any rate, Mr. Cress became acquainted with the knife- and was somewhat interested in it, and made some inquiries-about its manufacture. Mr. Cress after coming here in 1889,. had been a visitor at the family of Dr. Rice, and was on not only good social terms, but rather intimate terms with the family, that is to say, he was there often to spend the evening and usually dined with them on Sunday and they were on terms of friendship. He had mentioned this matter of the knife to Mrs. Rice and the family and they had some discussion concerning the same, and they made some trials of the knife. Mrs. Rice-herself had purchased one and was using it in her household.. Robert Rice, at this time had a son who had finished school,, and was at the age of about 26 years of age, and after he had come out of school he had not been engaged in any active business, bat had been taking up some smaller matters, had a little-tendency to music, and rather preferred a musical education, etc., but in this conversation that was held, it was suggested that it would be a good business to manufacture these knives, *189 a nice little business, and that Henry could have a share in the-business, and that it would make a good business for him.
Mr. Cress, who was certainly a very active, shrewd, energetic business man and a good financier, had found out that the knife was manufactured at Sandusky, by a Mr. Christy,, and he was not manufacturing many knives, and that Mr. Christy was in such a financial condition that he was not able-to push the business and was about to let .it go, and thereupon Cress, who first met a brother in law of Christy, I think at Clyde, and learned something more about the business, went toSandusky, and saw Mr. Christy himself and obtained an option in his own name for sixty days for the plant and a right to manufacture the knives, within which time he might purchase-upon the payment of $600 in money. This he reported to Mrs. Rice, and his original suggestion was that he would take half of the business and let Henry have one-fourth and that he-thought he could get the St. Rouis firm who was backing him to put up money to make the purchase and start the business, and take the other one-fourth. He accordingly wrote this firm and they wrote back very promptly that that was a matter he-ought not to bother with, to let it alone, and not have anything' to do with it, and thereupon he said to Mrs. Rice: “Why not you take an interest,” and Mrs. Rice said she believed she-would, it would be a good business and it would make her some pin money, perhaps, for herself, and her daughters, and' make a business for Henry, and she concluded she would do-it ; then he said, “I have no money to come into this concern, I don’t want to draw money out of .the Trommer Malt Company, cannot you furnish the money.” -She said then that she had anuncie, Mr. John Fry, who was a man wealthy for a farmer,, and had no children and was a friend of hers and her children, and had often said he proposed to make them heirs or largely heirs of his estate, and she thought her uncle John would help-her. Thereupon she said she would see and in a short time she saw Mr. John Fry, who lived at Ballville; and she laid the-whole matter before him, and wanted to know if he couldn’t help her; he said he thought it was a good thing, and felt favorable to Henry going into business, but he said he had no-money, cash in hand, but he would gladly help them and give-them the use of his name if they could raise the money, borrow *190 . it anywhere. She then communicated that to Mr. Cres' and then it was said they would see what could be done about jor- , rowing money.
Now, according to the testimony of the witnesses, Mrs. Rice, Mr. Cress and members of the family, up to this time no com- : munication in regard to this matter had been made to Dr. Rice, it. wasn’t spoken about, they thought he would not look upon . the matter very favorably; that he had a farm down the river that seemed to be taking all the spare cash he could raise; it would appear from the evidence that he was doing a little fancy farming, and that it required about all the spare money a professional man could get hold of, as it usually does, to carry it , ©n. However, Mrs Rice said she would lay the matter before the doctor and see what he thought about it and see if he could suggest where they could raise the money on the credit of Mr. John Pry. He did not seem to be very favorably impressed with the scheme, but said he thought the money could be obtained from a patron of his, and thereupon he applied to Mr. Vandercook of this city, who was willing to loan the money; then the note was drawn, either then or soon after, and presented by Dr. Rice to Mr. John Pry, who signed it, and Dr. ’Rice himself signed it, and thereupon the $1,500 was borrowed.
It was said in a conversation between Mr. Cress and Mrs. Rice and Henry that they would start the business first as a partnership, and if it should prosper they would afterwards in- ■ corporate it, and the matter of incorporation was explained at ■ some length by Mr. Cress to Mrs. Rice and to Henry. Suffice .it to say the business was started, and it run along in the spring of 189T, and seemed to be a paying business; it had been moved to Premont and was carried on here in Arch street and - in that fall it was incorporated, the articles of incorporation being drawn in August, but not signed until October, at which time the books were opened and the respective parties signed for stock. It was agreed that the capital stock should be $5,000, divided in one hundred shares at $50, each; that Mr. Cress should have fifty shares, and fifty should go to Mrs. Rice and Henry, and as between themselves, Mrs. Rice was to have thirty-four and Henry sixteen. It was necessary, under the laws of the state, it was said, to have five directors; upon the ; final organization of the company, Henry Rice assigned one *191 share of his stock to Mr. Sherwood, a friend of the family, a person who had been engaged in and about the Trommer malt concern, I believe, for some time-, a.nd Mrs. Rice assigned two-shares of her stock to Dr. Rice, and that left Mrs. Rice with-thirty-two and Henry with fifteen shares of stock. Upon the suggestion of Mr. Cress, Dr. Rice'was elected president, and,. Mrs. Rice said she didn’t want to appear as a director in the company and suggested that Dr. Rice bcome a director. Mr.. Cress, however, became managing director, Dr. Rice being president. The business was carried on from that time until June, I think, 1893, it was-carried on for a period of two years in all; there had been some dividends or division of profits in the fall of 1891. It was sold at that time, the Rices sold their interest to Mr. Cress for $42,000, and they had drawn out of it, of the earnings of the- corppany, so they had made in fact out of the business in that two years about $48,000 in actual! money.
In 1886 and again in 1887, perhaps, conveyances were made of some property, real estate that Dr. Rice had, to other parties, for instance to her brother and to his wife’s father. After' these moneys had been earned in the Christy'Knife Company, purchases were made of real estate; usually they were subjected to mortgage, but not always,, and it is to subject this real estate to the payment of the debts of Dr. Rice that this suit has been instituted, and the question here is, the real question, the main question, to whom did this business belong? To-whom did this money that was earned belong? Who had the right to have the proceeds of whatever was purchased with that money ?
Tt is claimed here, and reference in made in Glidden, Murphin & Co., v. Taylor, 16 Ohio St., 509, that inasmuch as-Dr. Rice was giving his time and attention to this business and was practically giving all of the time, as if the business was his own, that therefore in truth and in fact it was his, and that the one-half of the whole earnings of the company were his,, and that the creditors had a right to subject that money to the-payment of their debts.
Now that case was decided in i860; the facts, however' arose prior to i860. It was a case arising in Darke county' *192 ' where a man and his brother had been carrying on a foundry tand machine shop and had failed; a part of the property was ■sold by one of the creditors to one W. A. Weston, who told -Mr. John B. Taylor that he might’ take it as his agent and dis'pose of the same to the best advantage; he did sell it and gave a portion of the money to his wife, it was only a few hundred dollars; subsequently John B. Taylor, acting for his wife, purchased in her name the foundry and machine shop subject to •the liens thereon and paid a part of the liens. He then took hold of the property as the agent or trustee of his wife, and ¡told his wife he would see what he could do about making some-.money out of it, and went to work and carried on the ’.business in which his own mechanical skill and ability and • energy was '.the particular feature in producing beneficial results. He supported his family out of the business and also had a surpus of a few thousand dollars, which he invested in ¡real estate, in his wife’s name, and subsequently the creditors came forward and filed their petition and brought suit to subject it to the payment of his debts. The supreme court held in that case, raising the question first whether it was in fact her -.money or bis, but assuming that it was hers, they held that inasmuch as his skill and labor had gone into the earnings of the business, gone into making a success of the business, gone into :the production of the moneys that were received for the business, that therefore, it was his business; that it was the same as if he had started the business and simply put it in the name of another person.
However in Quigley v. Graham, 18 Ohio St., 42, two years 'later, in a case that arose at that time, they held that moneys that had been received in that manner prior to the act of that date became the property of the husband, and, as we all know, in common law the property of the wife, unless settled upon her by separate deed, which effectually protected it from the husband, gave in fact all of her personal property upon marriage to the husband in full. And I may say that from 1846 down to 1887, a great variety of statutes have been passed in regard to the rights of a married woman to her property. I have not time to discuss all these various statutes, but March Ty, 1887, 84 O. Ly-, 132, there was a statute passed by the legis *193 lature of this state which swept out all of these prior statutes, and established, I think, very 'independent relations between husband and wife.
Section 3111, Rev. Stat., provides that neither husband nor wife has any interest in the property of the other except as mentioned in secs. 3110 and 4188, Rev. Stat., which provide for dower interest. That is only a line across the page, but it has swept away a vast body of-law which had-been a part of the common law; “neither the husband or the wife has any interest in the property of the other,” except as mentioned in these two statutes.
We had occasion to pass upon that week before last in Williams county, where a man had loaned to a woman a sum of money, and afterwards they intermarried, and subsequently were divorced. He sued for the money he had loaned. Her attorney, with a «great deal of ingenuity and ability, argued that the obligations arising out of the marriage relation made the husband liable for the debts of his wife, and inasmuch as he became liable to pay that debt, that he couldn’t compel the wife 'o pay it to him. We held that she had no interest in his property by marriage, and she could not make any lawful claim! to the $150. It was his.
Section 3112, Revised Statutes, provides: “A husband or wife may enter into any engagement or transaction with the other or with any other person, which either might if unmarried; subject, in transactioins between themselves, to the general rules which control the actions of persons occupying confidential relations with each other.”
Now that is the statute, which also swept out a vast mass of law that had been existing for centuries. The old law had been modified from time to timje in some respects until finally this statute was passed. Now, as we understand it, the proper construction of this statute is, and we so hold, that as between husband and wife, the wife or husband may contract in regard to property the same as if unmarried, and the same rule should he applied in regárd to their rights, in regard to property or contracts or agreements, as would be applied between other parties. It is true that the court should scan carefully any agreements that have been made between husband and wife *194 in regard to the ownership of property if creditors intervene; still, if, in the course of business, the wife employs the husband, she may do it upon the same terms and conditions upon which any other person may employ another person. Now, it seems to us the result of this statute, is this: that it enabled the wife to enter into a contract with Mr. Cress, form a partnership with him and with the son, just as freely and with the same rights that the son himself might do, he being of age, and in any employment that was made by the husband after that time by either of these parties, they would stand in the same relation to each other that would exist between airy two persons who are unmarried, or between two gentlemen, if you please, in regard to a like employment.
Now, one word, in regard to this contract. It' has been argued at considerable length that this contract is not natural, that if the conversation took place perhaps «did not mean exactly what they said. It is argued that, admitting them to be true, certain facts followed in regard to the actions of Dr. Rice, with reference to this property, that should give color to that contract, or should abrogate it, or set it aside. We have examined the testimony very carefully; the testimony of Mr. John Fry, who testifies in regard to the agreement of borrowing this money for the purchase of this property, and he states, and no doubt he states truthfully, that Mrs. Rice applied to him for this loan, stating the purpose for which she wanted it, stating that Mr. Cress had agreed that in case there was a loss he would pay one-half of it and suggested to him that if the other half was less, that inasmuch as he had been kind enough to say he intended to make her an heir, that whatever loss there was might be deducted from anything that he might be willing to gi\e her or had expected to give her Now, Mrs. Rice testifies, her son and daughter testify, and Mr. Cress testifies, and Mr. Rice testifies. Now, these facts occurred in 1890. There have been some discrepancies in regard to the testimony; there has been some forgetfulness; there have been some variations, but-we think we are not able to say there has been a greater variation in that respect than would ordinarily exist in the repetition of a story between five different persons after the lapse of eight or nine years, or five years, or even a year, because we all know, if we would observe in regard to our *195 selves, that our memory in regard to events is treacherous, and oftentimes it is a long time before we remember the transactions exact!} as they occurred. We see nothing at any rate in the testimony of all these parties that would lead us to conclude "hat they have said anything except which they believe to be the truth, and that which, according to their memories, existed at the time that these various arrangements were made. We would not feel justified, we cannot feel justified in holding or believing that there had been a confederation of these parties to make statements that should be different in substance from the actual facts and agreements that were made at thar time.
That being the condition of affairs we .hold that Mrs. Rice as well as her son, Henry Rice, might contract with Mr. Cress and carry on this business, and that in any contract they made with him, their acts in regard to' it, their declarations, their statements from time to time, their actions in regard to it are to be tried by the same general rules or interpretations you would place upon the acts of other parties in regard to a like subject matter. It is true, we find it to be true, thát Mr. Rice originally signed the note; that he took this money and deposited it in the bank in his own name; that he afterwards drew out a portion of it, $600, that went to pay for this, we think the same money — and there is some dispute about it— went to pay for this original plant. That left $400 that he originally put in the bank and he drew it out afterwards on one or two occasions, and that money in substance went into the starting of this manufacturing establishment here in Fremont. He states, and his wife states,, that $15° was given to Mr. Cress: he states, and his wife states, that $350 was handed to Mrs. Rice, and she states how she kept that money, how she placed it in the house until she delivered it over to him to be "used 'in the payment of expenses in the starting of the plant. We find that $1,500 that was borrowed of Mr. Vandercook "went into the purchase of this plant and to the starting of it. It is true that from that time forth Dr. Rice was president of the company; that he often drew money, and sometimes this money woüld be drawn or deposited in the name of the wife or sor, and he controlled it. He went to the bank’ and obtained *196 the change of it or practically the payment of it, and one thing is remarkable: that while these certificates of deposit were being-issued or drafts in the name of wife or son, the bank took his signature, his endorsement for it, a very remarkable thing; of course it showed the banks had confidence in him and treated him as a capable business man, as a person who was reliable and who had a right to control the funds in his hands.
The matter ran along until 1893, after the sale. At one time he had some $19,000 of that money deposited. He loaned that to the cashier of the plaintiff bank for the bank at and during or about the commencement of the panic of 1893, and that, by written contract at the time, was loaned by him as agent; that the money, so far as that amount was concerned, was not claimed by him; that he had simply represented other parties ;I think the testimony of some of the witnesses shows that he stated that he represented his wife and son, but in regard to all that matter we see no practical difficulty. We see no reason why if this wife has a right to own this property and contract, she had not the right to employ her husband and request him to look after her interest in regard to the matter from time to time. She has so testified and we believe it to be true, that she was informed from time to time about the money that was being made and dividends, etc., that she approved and ratified the act of her husband in taking this money and preserving it as he did, she approved of the money being used for the support and maintenance of the family; she approved also 'of some $3,500 being used in the payment of debts that her husband owed; $1,500 was a store bill that had been made by her upon behalf of the family for family uses and purposes, and to a brother I believe of Dr. Rice. These sums were paid 'indeeed with her consent, and with the consent of the young man, who lived at home at the time. But we do not find, cannot find from the evidence, that it was Dr. Rice’s skill or labor or effects that produced the valuable results in the business. He -was practicing medicine but looked after his wife and son’s interest in the business, but we think other heads and hands produced results.
Now in 1886, Dr. Rice was living on Arch street, in a home that had been built by his father and which was then owned *197 by him He had married the daughter of Henry Fry, a brother of John Fry, who was also a -farmer of Ballville township and a man of considerable riieans, large means for a person who bad earned it all himself. ..
Dr. Rice was married in 1865, and had from time to time borrowed money from his father.in law; some of these notes had extended' over a period of fifteen years or nearly that long; then Mr. Fry had had them- renewed. These notes, in the fall of 1886, amounted to about $3,000, on the face; interest and all, to about $3,500; and thereupon, ab.out that time, Dr Rice had purchased property in the city known as the Pease property, and was talking about building on that property and going there to live, and Mr. Fry knew of this, and concluded he would collect his money if they were going to move, and if he could get the money lie would see if he could not get the real estate; said he would rather have the real estate than to have the notes; thereupon' he approached Dr. Rice and suggested to him that he would like to have him pay_ the $3,500. Dr Rice said he had no money to do it, and the old gentlemen suggested to him that if he couldn’t pay, that if he was going to move into the Pease property, he might want to sell the place where he was and the doctor said he was willing to do it, and thereupon it was agreed that a conveyance was to be made of that property by Dr. Rice to Mr. Fry for’$3,000 or $3,500, for the notes, whatever they amounted to.- A deed was made and that was consummated, and the notes were returned to Dr. Rice and they are in the possession now of the court. Subsequently,, in 1887, the year following, Mr. Fry says he was having a conveisation with his wife in regard to some advancements that had been made for another daughter, and saying he had not done -anything for Mrs. Rice, he suggested perhaps they had better give her that lot, and the mother said he had better do it, and he soon had a deed drawn and gave it to Mrs. Rice„ made her a present of the homestead, and she owns it today.. Now upon that property, as the moneys were earned from the-Knife Company, improvements were made to the amount of $io,ooo, the entire work, and carpeting and matters of that, kind, perhaps $4,000 more, making about $14,000 they put into' that property; that is one of the pieces of property they seek *198 to subject and the question now is whether that transfer was a •valid, bona fide transfer, and whether the property was lawfully and rightfully the property of Mrs. Rice in the fall of 1887 and from that time on.
It has been suggested that it was made as a conveyance in the nature of a mortgage by Dr. Rice to Henry Fry, and that character would stand upon the property to this time, and that Dr. Rice would have a right to redeem that property to make a sale of it for the payment of these debts.
We examined carefully the testimony of Mr. Fry and we see nothing in it that would enable us to say that it was a conveyance made in the nature of a mortgage, or in any form as a mortgage; we believe, and we hold it to be so, that the transfer was an absolute transfer from Dr. Rice to Flenry Fry as a deed of gift to his daughter Cynthia, and that there was a full consideration for the property passing between Dr. Rice and Henry Fry, although as between the father and daughter it was a gift. It has .been said that Mrs. Fry did not sign the ■deed, and it has been argued that that in some manner casts ■some reflection upon the validity of the transfer, or rather its bona ñdes, but it has been srtggested by my associates that there was no reason why Mrs. Rice should have given her dow■er interest in the payment of her husband’s debts, besides her father, I think, myself, thought all the tinte the property would go to the daughter; he said he had made up his mind not to give any more money to his son in law, and if he had any prop- . erty he would pass it to his daughters, and no doubt he was carrying that out, and we hold that this was a valid transfer of property to Mrs. Pice.
■ Now subsequently, and I forgot the year, John Fry still being alive, and still as I. said before, having no children, he proposed to sell his farm in Ballville to his niece, Mrs. Cynthia Rice, wife of Dr. Rice, and he made a proposition to her which was carried out and was put into writing and its obligations •were secured by mortgage, and practicall}- he sold the farm, -consisting of 262 acres of land in Ballville township to his -niece, upon the basis, she was to. pay down $2,000 in cash, -which money was paid out of the Christy Knife Company Tunds.. They then were to pay to the old gentleman, John *199 Fry, one thousand dollars a year in semi-annual payments of $500 each during his life time, and upon his death they were to pay certain sums to different heirs, I have never figured the exact amounts, but perhaps $3,000 or $4,000, more or less. (Attorneys suggested that the amount was $6,000.) That property was transferred and the Rices went into possession of it, and they built upon it a house and barn. It was thought by the old gentleman at the time the transfer was made that the income ought to about equal the amount of money he was to receive. He said he had made some $600 a year off of it, was the least he had ever made and had made as high as $1,300 a year, and he thought that would pay his annuity. That piece of property it was sought to subject to the payment of this debt on the ground that the moneys that went into the purchase was money from the Knife Company, and therefore the property of Dr. Rice. We hold this to be a valid sale, and that Mrs. Rice is properly the owner of the property.
There were other pieces of property involved, but I will not go into the details in regard to them;, but say we think the conveyances made upon sufficient consideration and in good faith.
This is the view we take of the case: we find that Robert H. Rice was acting as the agent of his wife and son, and at their request, rightfully, and that by virtue of this action he neither in fact or in law acquired any real interest in the propert}'- that was made by the Christy Knife Company. That practically disposes of this case, and the decree of the court therefore will be that these respective petitions be dismissed.
By Mr. Harris, counsel for the plaintiff: I have not noticed that the court has said anything about the insolvency of Dr. Rice from 1890 when the Christy Knife Company business.was purchase, and- from that time on.
By Court: I think we will not hold at present that he was insolvent until the crisis came in 1893; if we change-our views on that before the findings of fact come to us, we will let you know.